# United States Court of Appeals
## For the First Circuit

No. 19-1802

CITY OF PROVIDENCE and CITY OF CENTRAL FALLS,

Plaintiffs, Appellees,

v.

WILLIAM P. BARR, in his official capacity as United States
Attorney General, and the UNITED STATES DEPARTMENT OF JUSTICE,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Barron, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Brian H. Pandya, Deputy Associate Attorney General, Civil
Division, U.S. Department of Justice, with whom Joseph H. Hunt,
Assistant Attorney General, Aaron L. Weisman, United States
Attorney, and Daniel Tenny and Brad Hinshelwood, Attorneys,
Appellate Staff, were on brief, for appellants.
Jeffrey Dana, City Solicitor, with whom Megan Maciasz
DiSanto, Senior Assistant City Solicitor, and Etie-Lee Z. Schaub,
Associate City Solicitor, were on brief, for appellee City of
Providence.
Matthew Jerzyk, City Solicitor, for appellee City of Central
Falls.

---

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

Peter F. Neronha, Attorney General of Rhode Island, Michael W. Field, Assistant Attorney General, Letitia James, Attorney General of New York, Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, Eric R. Haren, Special Counsel, Linda Fang, Assistant Solicitor General, Xavier Becerra, Attorney General of California, Phil Weiser, Attorney General of Colorado, William Tong, Attorney General of Connecticut, Kathleen Jennings, Attorney General of Delaware, Kwame Raoul, Attorney General of Illinois, Brian E. Frosh, Attorney General of Maryland, Maura Healey, Attorney General of Massachusetts, Dana Nessel, Attorney General of Michigan, Keith Ellison, Attorney General of Minnesota, Aaron D. Ford, Attorney General of Nevada, Gurbir S. Grewal, Attorney General of New Jersey, Hector Balderas, Attorney General of New Mexico, Ellen F. Rosenblum, Attorney General of Oregon, Thomas J. Donovan, Jr., Attorney General of Vermont, Robert W. Ferguson, Attorney General of Washington, and Karl A. Racine, Attorney General for the District of Columbia, on brief for states of New York, Rhode Island, California, Colorado, Connecticut, Delaware, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Vermont, and Washington and the District of Columbia, amici curiae.

Omar C. Jadwat, Lee Gelernt, Cody Wofsy, Spencer E. Amdur, My Khanh Ngo, American Civil Liberties Union, Mark Fleming, Katherine E. Melloy Goettel, National Immigrant Justice Center, Nicholas Trott Long, and ACLU Foundation of Rhode Island on brief for American Civil Liberties Union, American Civil Liberties Union of Rhode Island, National Immigrant Justice Center, National Immigration Law Center, Washington Defender Association, Southern Poverty Law Center, Northwest Immigrant Rights Project, and New Orleans Workers' Center for Racial Justice, amici curiae.

---

March 24, 2020

---

SELYA, **Circuit Judge**.  After a number of state and local governments refused to assist in federal enforcement of certain immigration-related laws, the United States Department of Justice (DOJ) purposed to condition some unrelated federal law enforcement grants on the provision of such assistance.  Unwilling to retreat from their so-called "sanctuary" laws and policies, several state and local governments pushed back.  A rash of litigation ensued, and a circuit split has now developed.  Compare New York v. U.S. Dep't of Justice, 951 F.3d 84, 123-24 (2d Cir. 2020) (upholding grant conditions imposed by the DOJ), with City of Philadelphia v. Attorney Gen., 916 F.3d 276, 279 (3d Cir. 2019) (invalidating such conditions).  The case at hand requires us to take sides in this circuit split.

To put the critical issues into perspective, it helps to revisit the genesis of the underlying suit.  Two affected Rhode Island municipalities — Providence and Central Falls (collectively, the Cities) — are among the state and local governmental entities that decided to resist the DOJ's actions.  To that end, they repaired to the federal district court and sought to invalidate the conditions that the DOJ had imposed on grant funds allocated to them.  The district court ruled in the Cities'

favor, see City of Providence v. Barr, 385 F. Supp. 3d 160 (D.R.I. 2019), and the DOJ appealed.[1]

At the time the parties appeared for oral argument before us, three courts of appeals had refused to enforce some or all of the challenged conditions.  See City of Los Angeles v. Barr, 941 F.3d 931, 934 (9th Cir. 2019); City of Philadelphia, 916 F.3d at 279; City of Chicago v. Sessions, 888 F.3d 272, 287 (7th Cir.), reh'g en banc granted in part on other grounds, vacated in part on other grounds, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), reh'g en banc vacated, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).  After oral argument, the plot thickened: the Second Circuit upheld all of the challenged conditions, see New York, 951 F.3d at 123-24, thus creating a circuit split.  We have carefully considered the district court's useful rescript, the comprehensive briefs of the parties and the amici, the DOJ's kitchen-sink-full of clever legal arguments, and the thoughtful but conflicting views of sister circuits.  At the end of the day, we conclude that the DOJ's reach exceeds its grasp; it lacked authority to impose the challenged conditions.  Consequently, we affirm the judgment below.

---

[1] The Cities sued not only the DOJ but also the Attorney General in his official capacity.  For ease in exposition, we refer throughout to the DOJ as if it were the sole defendant.

## I. BACKGROUND

For simplicity's sake, we bifurcate our statement of the relevant background. First, we trace the anatomy of the grant program that underlies this litigation. Second, we sketch the origins and travel of the case.

### A. The Edward Byrne Memorial Justice Assistance Grant Program.

Congress established the Edward Byrne Memorial Justice Assistance Grant Program (Byrne JAG) in 2006 through the merger of two preexisting grant programs. See Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006); see also 34 U.S.C. § 10151. Byrne JAG provides grants to state and local governments for personnel, equipment, training, and other uses connected with certain criminal justice programs. See 34 U.S.C. § 10152(a)(1). To be eligible for Byrne JAG funding, a program must fall within the reach of eight broad categories, including "[l]aw enforcement programs," "[c]orrections and community corrections programs," and "[c]rime victim and witness programs." Id.

The DOJ administers Byrne JAG funding through its Office of Justice Programs (OJP), which also oversees other federal law enforcement grant programs. See id. §§ 10101, 10110. A Senate-confirmed Assistant Attorney General (Assistant AG) heads the OJP, even though the Attorney General retains ultimate authority over the OJP's functions. See id. The statute that authorizes the OJP

directs the Assistant AG to engage in various information-sharing, liaison, and coordination duties.  See id. § 10102(a)(1)-(5).  The Assistant AG also must "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants."  Id. § 10102(a)(6).

Importantly, Congress structured Byrne JAG as a formula grant program.  Rather than exercising its own discretion as to which jurisdictions receive grants and in what amounts, the DOJ is obliged to distribute funding pursuant to a statutory formula.  See id. §§ 10152(a)(1), 10156; see also City of Los Angeles v. McLaughlin, 865 F.2d 1084, 1088 (9th Cir. 1989) (describing difference between formula and discretionary grant programs).  The Byrne JAG formula divides Congress's annual appropriation among states based on their relative populations and rates of violent crime (with each state receiving a minimum of one-quarter of one percent of the total).  See 34 U.S.C. § 10156(a).  Of the funding allocated to a given state, up to sixty percent goes to the state government and no less than forty percent goes to localities within the state.  See id. § 10156(b)-(c).  Relative rates of violent crime determine the allocation of funds among localities.  See id. § 10156(d)(2)(A).  No local government may receive a Byrne JAG grant that is larger than its "total expenditures on criminal

justice services for the most recently completed fiscal year for which data are available." Id. § 10156(e)(1).

Congress has allowed a carefully circumscribed number of deviations from this formula. Pertinently, the DOJ may reallocate up to five percent of Congress's total appropriation for special grants to address "precipitous or extraordinary increases in crime" or "significant programmatic harm resulting from operation of the formula." Id. § 10157(b). So, too, the DOJ may retain up to $20 million to help local governments upgrade their law enforcement technology and another $20 million to fund antiterrorism training programs. See id. § 10157(a). In addition, Congress has authorized the DOJ to withhold a small percentage of a Byrne JAG grant if the designated recipient fails to comply with certain specified federal law-enforcement-related mandates. These mandates include requirements that states establish a sex offender registry, see id. § 20927(a) (mandatory ten percent reduction), provide records to a national criminal background check database, see id. § 40914(b)(2) (mandatory five percent reduction), and report the deaths of individuals in custody, see id. § 60105(c)(2) (discretionary reduction of up to ten percent).

To receive its share of funding, a state or local government must apply annually to the DOJ. See id. § 10153(a). The applicant's proffer must make certain certifications and assurances concerning the application and the programs for which

the applicant seeks funding. <u>See</u> <u>id.</u> For example, each applicant must provide "[a]n assurance that, for each fiscal year covered by an application, [it] shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," <u>id.</u> § 10153(a)(4), and "[a] certification . . . that . . . there has been appropriate coordination with affected agencies," <u>id.</u> § 10153(a)(5)(C). Applicants also must certify that they "will comply with all provisions of this part [the Byrne JAG statute] and all other applicable Federal laws." <u>Id.</u> § 10153(a)(5)(D).

After it approves a Byrne JAG application, the DOJ issues a grant award letter that the designated government entity must sign to receive its grant. In this letter, the DOJ typically lists a few so-called "special conditions" with which the designated grant recipient must comply. Some conditions relate to the recipient's administration of the grant (such as collecting and maintaining data on the funded programs, cooperating with the DOJ's monitoring of the grant, and attending DOJ events and conferences). Others require that recipients that use their funding for certain purposes (including purchasing police equipment and developing training materials) adhere to federal guidelines. Recipients likewise must obey federal information technology, training, and nondiscrimination regulations and policies. Every grant award

letter states that the DOJ may either withhold or terminate funding if the recipient does not comply with these conditions.

### B. __The Origins and Travel of the Case__.

This appeal arises indirectly from long-simmering tensions between the federal government and various states and localities that have refused to assist wholeheartedly in the enforcement of certain federal immigration laws and policies — and it arises directly from those tensions involving the federal government and the Cities.  In order to limit such assistance, a number of state and local governments have enacted sanctuary laws and policies, which prohibit their officials from taking certain actions that would help federal immigration authorities locate and detain potentially deportable noncitizens.  Such laws and policies include bans on notifying federal immigration authorities when a law enforcement officer takes into custody or releases a noncitizen.  So, too, some jurisdictions refuse to comply with federal immigration detainers, which ask state and local law enforcement agencies to hold noncitizens beyond their scheduled release from criminal custody (thus permitting immigration authorities to detain them).  See 8 C.F.R. § 287.7(a), (d); Morales v. Chadbourne, 793 F.3d 208, 214-15 (1st Cir. 2015).

In May of 2016, the DOJ's Inspector General issued a report identifying several state and local governments that were receiving federal law enforcement grants (including Byrne JAG

grants) and had enacted sanctuary policies that, in one way or another, limited their cooperation and information sharing with federal immigration authorities.  The Inspector General suggested that many of these policies violated 8 U.S.C. § 1373, which prohibits federal, state, and local laws and policies that restrict the ability of government entities and officials to maintain information regarding any individual's immigration status and share that information with federal immigration authorities.  See 8 U.S.C. § 1373(a)-(b).  Throughout 2015 and 2016, members of Congress introduced various bills that would have made compliance with section 1373 a condition of federal funding for states and localities.  None of these bills became law.  See City of Chicago, 888 F.3d at 277-78 (collecting bills).

These legislative initiatives stymied, the DOJ notified Byrne JAG grant recipients that it had determined that section 1373 was an "applicable federal law" for purposes of the program.  Going forward, state and local governments would, therefore, have to certify compliance with section 1373 as part of the Byrne JAG application process.  See 34 U.S.C. § 10153(a)(5)(D) (requiring applicants to certify that they "will comply with . . . all other applicable Federal laws").  The DOJ announced that, beginning with fiscal year 2017 (FY2017), it would investigate suspected violations of section 1373 and impose sanctions — including the withholding of grant funds — on jurisdictions that did not remedy

such perceived violations.  The DOJ also informed prospective Byrne JAG applicants that FY2017 grants would for the first time include conditions requiring specific assistance with immigration enforcement efforts.  According to the DOJ, these conditions were designed to ensure that the federal government was not supporting states and localities that were undermining its ability to protect the public by removing noncitizens who had committed crimes.

The Cities have received Byrne JAG grants annually since the program's inception.  Each of them applied for Byrne JAG grants for FY2017.  Providence planned to use its grant to cover overtime expenses for officers conducting patrols in "hotspot" areas, hire a part-time bilingual police liaison, and place an advertisement in a local newspaper.  Central Falls sought funding to upgrade its police department's information technology systems.

On June 26, 2018, the DOJ notified the Cities that it had approved their applications and awarded Providence and Central Falls grants of $212,112 and $28,677, respectively.  In the grant award letters, the DOJ included three conditions tailored to compel cooperation with federal immigration authorities, none of which had been a condition on Byrne JAG grants in prior fiscal years:

- The notice condition:  Grant recipients must implement a law, policy, or practice that ensures that their correctional facilities will "honor" any "formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien."

- **The access condition**:  Grant recipients must implement a law, policy, or practice that gives federal immigration agents access to "correctional facilit[ies] for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States."

- **The certification condition**:  Grant recipients "must submit the required 'Certification of Compliance with 8 U.S.C. [§] 1373'" and ensure "[o]ngoing compliance with 8 U.S.C. [§] 1373."

The Cities took issue with the notice, access, and certification conditions (collectively, the challenged conditions), which conflicted with specific sanctuary policies that they had embraced.  For instance, neither of the Cities allows its law enforcement officers to retain custody of a noncitizen based solely on an immigration detainer or other request from immigration authorities, absent a court-issued warrant.  A Providence ordinance forbids police officers from even inquiring about any individual's immigration status.  Similarly, police officers in Central Falls do not stop or question individuals based on their immigration status.  The Cities believe that these policies build trust between their law enforcement agencies and immigrant communities and ensure that noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as witnesses.

Dismayed by the DOJ's attempt to superimpose its policy views on their law enforcement efforts, the Cities decamped to the

federal district court and sued the DOJ.  They sought to enjoin the DOJ from imposing the challenged conditions on their FY2017 Byrne JAG grants.  In relevant part, the Cities alleged that the DOJ did not possess statutory authority to impose the challenged conditions, that the imposition of the challenged conditions was arbitrary and capricious, and that the challenged conditions were unconstitutional.

After some procedural skirmishing not relevant here, the parties filed cross-motions for summary judgment.  The district court granted summary judgment for the Cities, holding that the DOJ exceeded its statutory authority in imposing the challenged conditions on their Byrne JAG grants. See City of Providence, 385 F. Supp. 3d at 164-65.  The court permanently enjoined the DOJ from enforcing the challenged conditions and — in aid of that injunction — issued a writ of mandamus directing the DOJ to disburse the Cities' FY2017 grant funds to them.  This timely appeal ensued.[2]

---

[2] In October of 2018, the DOJ approved the Cities' Byrne JAG applications for fiscal year 2018 (FY2018).  The grant award letters contained both modified versions of the challenged conditions and some new immigration-related conditions.  After the Cities amended their complaint to challenge the FY2018 conditions, the district court bifurcated the FY2017 and FY2018 claims.  The court entered partial final judgment on the FY2017 claims under Federal Rule of Civil Procedure 54(b), conferring appellate jurisdiction over this appeal.  See United States v. Univ. of Mass., Worcester, 812 F.3d 35, 44-45 (1st Cir. 2016).

## II. ANALYSIS

We review the district court's entry of summary judgment de novo, taking the facts and all reasonable inferences therefrom in the light most agreeable to the nonmovant. See Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011). "We will affirm only if the record reveals 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). The fact that the parties brought cross-motions for summary judgment does not alter our standard of review. See Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996).

The briefs in this case mix policy arguments with legal arguments. The Cities view their sanctuary policies as consistent with the best traditions of a free and open society. The DOJ, however, views those policies as antithetic to its efforts to enforce a series of validly enacted immigration-related laws. We need not plunge into these troubled waters. The issue before us is not whether sanctuary policies are good or bad — that issue is for the political branches, not for the courts. Instead, we focus on the parties' legal arguments, which coalesce into a single dispositive issue: did the DOJ lawfully impose the challenged conditions on the Cities' FY2017 Byrne JAG grants?

The court below adopted the Cities' theory that the DOJ exceeded its statutory authority in imposing the challenged

conditions.  In this venue, the Cities reiterate this theory and argue, in the alternative, that the DOJ acted arbitrarily and capriciously when it imposed the challenged conditions.  Finally, they argue that the challenged conditions violate the Spending Clause of the United States Constitution.  See U.S. Const. art. I, § 8, cl. 1.  Like the district court, we begin — and end — with the proposition that the DOJ lacked statutory authority to impose the challenged conditions.

When an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress."  City of Arlington v. FCC, 569 U.S. 290, 297 (2013). It is no exaggeration to say that "an agency literally has no power to act . . . unless and until Congress confers power upon it." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986).  Any action that an agency takes outside the bounds of its statutory authority is ultra vires, see City of Arlington, 569 U.S. at 297, and violates the Administrative Procedure Act, see 5 U.S.C. § 706(2)(C).

The DOJ advances two sources of purported statutory authority for the challenged conditions:  the Byrne JAG statute itself, 34 U.S.C. §§ 10151-10158, and the duties-and-functions provisions relating to the Assistant AG for the OJP, 34 U.S.C. § 10102.  The question of whether either of these sources authorized the imposition of the challenged conditions reduces to

an exercise in statutory construction.  We therefore summarize the familiar principles that guide such an inquiry.

A court's lodestar in interpreting a statute is to effectuate congressional intent.  See Passamaquoddy Tribe v. Maine, 75 F.3d 784, 788 (1st Cir. 1996).  It is axiomatic that the quest to determine this intent must start with the text of the statute itself.  See Stornaweye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009).  When Congress uses a term in a statute and does not define it, we generally assume that the term carries its plain and ordinary meaning.  See id.  The context surrounding a statutory provision and the structure of the statutory scheme as a whole often provide useful indicators of congressional intent.  See Atl. Fish Spotters Ass'n v. Evans, 321 F.3d 220, 224 (1st Cir. 2003); Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, 989 F.2d 1266, 1270 (1st Cir. 1993).  If the language employed by Congress evinces a plausible meaning for the disputed provision, our inquiry normally ends there.  See In re Hill, 562 F.3d at 32.  Other tools of statutory interpretation, such as legislative history, customarily carry significant weight only when the text is ambiguous or its plain meaning leads to an absurd result.  See United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987).

Against this backdrop, we proceed to examine the statutory provisions that the DOJ identifies as authorizing the imposition of the challenged conditions.

## A. **The Byrne JAG Statute.**

Our starting point is the Byrne JAG statute. See 34 U.S.C. §§ 10151-10158. No provision in the statute authorizes the DOJ to condition Byrne JAG grants on cooperation with federal immigration enforcement efforts in so many words. Recognizing this lack of specific authorization, the DOJ relies instead on three categories of assurances and certifications that the statute requires state and local governments to proffer in their Byrne JAG applications: maintenance and reporting of programmatic information, see id. § 10153(a)(4), coordination with affected agencies, see id. § 10153(a)(5)(C), and compliance with "all other applicable Federal laws," id. § 10153(a)(5)(D). We address the information-reporting and coordination provisions together and then shift the lens of our inquiry to the "applicable Federal laws" provision.

### 1. **The Information-Reporting and Coordination Provisions.** The information-reporting provision of section 10153(a) mandates that a Byrne JAG application include "[a]n assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General

may reasonably require." Id. § 10153(a)(4).  The coordination provision requires an applicant to certify that "there has been appropriate coordination with affected agencies." Id. § 10153(a)(5)(C).   The DOJ contends that these provisions authorized the imposition of the challenged conditions because those conditions request the sharing of "programmatic" information about a grant recipient's law enforcement and correctional activities and call for "coordination" with federal immigration authorities.

The DOJ's contentions stretch the statutory language beyond hope of recognition.  Under the DOJ's interpretation, the term "programmatic" in the information-reporting provision apparently would refer to any activity that a grant recipient undertakes within the eight categories of "programs" that the Byrne JAG statute allows grants to fund, without regard to whether the recipient's grant in fact funds that particular activity. Throughout the Byrne JAG statute, though, Congress used the term "program" in only two ways:  to refer to Byrne JAG itself, see, e.g., id. § 10151(a) ("The grant program established under this part shall be known as the 'Edward Byrne Memorial Justice Assistance Grant Program'."), or to refer to the specific criminal-justice-related activity that a Byrne JAG grant supports, see, e.g., id. § 10152(a)(1) (explaining that Byrne JAG provides funding "for criminal justice, including for any one or more of

the following [eight] programs"); id. § 10153(a)(5)(A) (requiring applicant to certify that "the programs to be funded by the grant meet all the requirements of this part").    In statutes that authorize other federal grant programs, Congress commonly uses the term "programmatic" in this same manner, that is, to denote the grant program and the activities that it funds.    See, e.g., 20 U.S.C. § 1232f(a); 29 U.S.C. § 3245(c)(2); 34 U.S.C. § 20305(a)(2)(B); 42 U.S.C. § 300ff-14(h)(3)(A).    The DOJ's contrary interpretation is little more than an ipse dixit; the DOJ advances no principled reason why we should interpret the term in so unorthodox a manner when construing the information-reporting provision.[3]    See City of Los Angeles, 941 F.3d at 944-45; City of Philadelphia, 916 F.3d at 285; see also Azar v. Allina Health Servs., 139 S. Ct. 1804, 1812 (2019) (explaining that courts should

---

[3] The DOJ mentions that each challenged condition is prefaced with some variant of the following language:  "[w]ith respect to the 'program or activity' funded in whole or part under this award."  The challenged conditions define "program or activity" by importing the broad meaning that the same phrase carries under Title VI of the Civil Rights Act of 1964.  See 42 U.S.C. § 2000d-4a (defining "program or activity" as "all of the operations" of various public and private entities that receive federal funding). If the DOJ seeks to argue that its own definition of the term "program" is entitled to deference, that argument is incorrect. This definition contradicts the plain meaning of the term as used in the statute and is, therefore, unreasonable.  See City of Los Angeles, 941 F.3d at 945 n.17; see also Quinn v. City of Boston, 325 F.3d 18, 33-34 (1st Cir. 2003) (explaining that courts should not defer to agency interpretations of statutes that are unreasonable or "contradict clearly ascertainable legislative intent").

"not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes").

The DOJ's definition of "programmatic" is inconsistent with the plain language of the statute in another way. The information-reporting provision requires that a grant applicant assure that it will maintain and report programmatic information "for each fiscal year covered by an application." 34 U.S.C. § 10153(a)(4). The fact that the statute ties the reporting obligation to the years "covered by an application" supports interpreting the term "programmatic" to refer to Byrne JAG itself and the specific activities that a grant funds. Treating "programmatic" as referring to law-enforcement-related activities that are not funded by a grant would gratuitously expand the scope of the term in a manner that contradicts the "fiscal year" language.

Turning to the coordination provision, we find once again that the DOJ's broad interpretation conflicts with the plain meaning of the statutory text. The DOJ reads the phrase "coordination with affected agencies" to refer to coordination with all law enforcement agencies affected by any activity of the grant applicant. It attempts to justify this interpretation by invoking a goal of the Byrne JAG program, which is also an objective of the OJP's work more generally: the promotion of law enforcement cooperation. See, e.g., 34 U.S.C. § 10102(a)(4)

(directing Assistant AG for OJP to "maintain liaison with
. . . State and local governments . . . relating to criminal
justice"); Omnibus Crime Control and Safe Streets Act of 1968,
Pub. L. No. 90-351, 82 Stat. 197, 197 (listing purposes of
predecessor grant program as including increasing "coordination of
law enforcement and criminal justice systems at all levels of
government").

The text of the provision itself belies this jerry-built
justification.  The statute requires an applicant to certify only
that there "has been" coordination, 34 U.S.C. § 10153(a)(5)(C),
and we must give effect to the verb tense that Congress has chosen
to employ, see Carr v. United States, 560 U.S. 438, 448 (2010);
Navarro v. Pfizer Corp., 261 F.3d 90, 100-01 (1st Cir. 2001).  That
tense makes pellucid that the coordination to which the statute
alludes must take place before a state or local government submits
its application.  Given this temporal limitation, we think it
manifest that the required coordination concerns the preparation
of an application and involves the agencies affected by the
programs for which the applicant seeks funding.[4]  See City of Los
Angeles, 941 F.3d at 945; City of Philadelphia, 916 F.3d at 285.

---

[4] Contrary to the DOJ's intimation, the Byrne JAG statute does
not address this type of coordination elsewhere in the list of
certifications and assurances required in an application.  See 34
U.S.C. § 10153(a)(3) (pre-submission opportunity for consultation
with the public); id. § 10153(a)(6) (submission of statewide plan

If more were needed — and we doubt that it is — both the statutory context and the formulaic nature of the Byrne JAG program undermine the DOJ's expansive construction of the information-reporting and coordination provisions. To begin, the canon of noscitur a sociis teaches that "statutory words are often known by the company they keep." Lagos v. United States, 138 S. Ct. 1684, 1688-89 (2018); see Wheeling & Lake Erie Ry. Co. v. Keach (In re Montreal, Me. & Atl. Ry., Ltd.), 799 F.3d 1, 8 (1st Cir. 2015). Under this canon, "a string of statutory terms raises the implication that the 'words grouped in a list should be given related meaning.'" S.D. Warren Co. v. Me. Bd. of Envtl. Prot., 547 U.S. 370, 378 (2006) (quoting Dole v. United Steelworkers, 494 U.S. 26, 36 (1990)).

The information-reporting and coordination provisions appear in a list of assurances and conditions that a Byrne JAG applicant must make with respect to the application and programs to be funded. See 34 U.S.C. § 10153(a) (requiring certification, inter alia, that grant will not supplant applicant's own funding and that applicant's governing body and the public had opportunity to review application). We presume that Congress intended these provisions to relate unreservedly to the application, grant, and programs to be funded. The broad authorization that the DOJ

on use of Byrne JAG grants developed in consultation with public and private entities).

purports to find in these provisions — the power to condition a Byrne JAG grant on the recipient's reporting of information and coordination on matters relating to any of the far-flung law enforcement operations that it conducts — is implausible in this context. See McDonnell v. United States, 136 S. Ct. 2355, 2368 (2016) (recognizing that canon of noscitur a sociis helps avoid expansive definitions that Congress did not intend).

In addition, it is nose-on-the-face plain that Congress intended Byrne JAG to operate as a formula grant program. See 34 U.S.C. § 10201(b)(2) (referring to Byrne JAG grants as "formula grants"). To carry out this intent, the DOJ must allocate funding in accordance with a detailed formula that takes into account population and violent crime statistics. See id. §§ 10152(a)(1), 10156. Congress was quick to specify those relatively few instances where it thought a deviation from this formula would be permissible. For example, the DOJ may reserve up to five percent of Congress's total appropriation for special grants to address "precipitous or extraordinary increases in crime," id. § 10157(b)(1), and it must withhold ten percent of a grant from a state that does not maintain a sex offender registry that meets federal standards, see id. § 20927(a).

Congress did not make an allowance for any deviation that would justify the actions undertaken by the DOJ in this case. And reading the information-reporting and coordination provisions

as broadly as does the DOJ would destabilize the statutory formula. In the DOJ's view, it can condition Byrne JAG grants on state and local governments assisting with unrelated federal law enforcement priorities through mandatory disclosure of information and coordination. But the statutory formula is not so elastic: it simply does not allow the DOJ to impose by brute force conditions on Byrne JAG grants to further its own unrelated law enforcement priorities. In fact, the express authorization for specific deviations from the formula strongly implies that Congress did not intend to give the DOJ the power to advance its own priorities by means of grant conditions. See City of Philadelphia, 916 F.3d at 286; see also Gonzales v. Oregon, 546 U.S. 243, 262 (2006) (declining to find broad and unrestrained authority for agency in statute that specifically describes agency's limited authority to act).

To sum up, we hold that the information-reporting provision authorizes the DOJ to require a Byrne JAG applicant only to assure that it will maintain and report information about its grant and the programs that the grant funds. See City of Los Angeles, 941 F.3d at 944-45; City of Philadelphia, 916 F.3d at 285. We further hold that the coordination provision authorizes the DOJ only to require a certification that the applicant has coordinated in the preparation of its application with agencies affected by the programs for which the applicant seeks funding.

See City of Los Angeles, 941 F.3d at 945; City of Philadelphia, 916 F.3d at 285.

None of the challenged conditions falls within the compass of this authority. With respect to the information-reporting provision, only the notice condition requires the disclosure of information to the federal government. That condition, however, calls for the Cities to report the release dates of noncitizens in their custody — information that does not pertain either to the Cities' Byrne JAG grants or to the police-related programs for which the Cities sought funding. The release dates of noncitizens do not, therefore, qualify as "programmatic" information. So, too, the purported reach of the challenged conditions exceeds the authority conferred upon the DOJ by the coordination provision: they mandate that the Cities cooperate with federal immigration authorities in manifold ways that are, without exception, unrelated either to their Byrne JAG grants or to the programs for which the Cities sought funding. The challenged conditions also require coordination on an ongoing basis during the term of the Cities' grants, not merely past coordination relative to the preparation of their applications.

We add a coda. Although the Second Circuit reached a similar conclusion about the meaning of the information-reporting and coordination provisions, it held that those provisions authorize the imposition of the notice and access conditions on

any grant that funds a program "relate[d] in any way to the criminal prosecution, incarceration, or release of persons." New York, 951 F.3d at 116-22.  The court explained that such programs include those for police task forces, prosecutors' and defenders' offices, and incarceration facilities.  See id. at 117-18.  The DOJ advances a similarly expansive notion of the scope of a funded program.  For example, it suggests that even if the term "programmatic" refers only to a Byrne JAG grant and the programs that the grant supports, the challenged conditions seek "programmatic" information from any grant recipient that uses its funding for a law enforcement or corrections program.

We reject this capacious view of the types of funded programs that would permit the imposition of the challenged conditions — a view that covers most (if not all) criminal justice activities that a state or local government may undertake.  For the reasons previously discussed, we think it would be wrong to hold that Congress gave the DOJ free rein to insist that Byrne JAG applicants furnish information and engage in coordination with respect to all of their law enforcement operations.  And while we do not foreclose the possibility that the challenged conditions may be sufficiently related to programs for which a different grant applicant seeks funding, the activities financed by the Cities' FY2017 Byrne JAG grants have no direct connection either to the removal of noncitizens or to the Cities' relationships with federal

immigration authorities.  It follows inexorably, as night follows day, that the DOJ lacked statutory authority to impose the challenged conditions pursuant to the information-reporting and coordination provisions of the Byrne JAG statute.

     **2.  The "Applicable Federal Laws" Provision.**  We turn next to the DOJ's asseveration that the certification condition is authorized by section 10153(a)(5)(D) of the Byrne JAG statute. That provision requires Byrne JAG applicants to certify that they "will comply with all provisions of this part [the Byrne JAG statute] and all other applicable Federal laws."[5]   34 U.S.C. § 10153(a)(5)(D).  The DOJ would have us interpret the phrase "applicable Federal laws" to cover all "laws that apply to Byrne JAG applicants and are germane to the grant."  Section 1373 qualifies as such a law, the DOJ claims, because it applies to state and local governments and mandates "cooperation between federal and state officials, which . . . is central to the Byrne JAG program."  The Cities rejoin that the phrase refers more narrowly to laws that apply to state and local governments qua

---

[5] Although the statute speaks only of certifying compliance with "applicable Federal laws," the conditions in the Cities' FY2017 grant award letters specify that the Cities both certify compliance with section 1373 and ensure ongoing compliance with the same statute throughout the period of the grants.  The DOJ's arguments do not meaningfully distinguish between these two requirements.  Because we conclude that section 1373 is not an "applicable Federal law," see text infra, we take no view on whether the DOJ may condition a Byrne JAG grant on ongoing compliance with such a law.

Byrne JAG grant recipients.  They hasten to add that section 1373 does not fit within this narrower taxonomy.  The statutory text, on its face, fails to resolve this dispute:  it neither defines the term "applicable" nor explicitly indicates the scope of federal laws that fall within the ambit of this provision.

The dictionary defines "applicable" to mean "capable of being applied" or "fit, suitable, or right to be applied." Webster's Third New International Dictionary of the English Language Unabridged 105 (Philip Babcock Gove ed., 2002).  Relying heavily on this generic definition, the Second Circuit interpreted the phrase "applicable Federal laws" to encompass all federal laws "pertaining either to the State or locality seeking a Byrne grant or to the grant being sought."  New York, 951 F.3d at 106.  The court reasoned that a statute "can" or "may" be capable of being applied or fit to be applied both to persons (such as the grant applicant) and to circumstances (such as the grant itself).  Id.

Courts must be wary of simplistic solutions and, unlike the Second Circuit, we do not believe that the dictionary definition clarifies the meaning of the term "applicable" as used in this context.  After all, "words are like chameleons; they frequently have different shades of meaning depending upon the circumstances."  Doe v. Leavitt, 552 F.3d 75, 83 (1st Cir. 2009) (quoting United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004)). A federal law may be "capable of being applied" or "fit to be

applied" in an infinite number of ways, and the range of
interpretations advanced by the Second Circuit, the DOJ, and the
Cities are all consistent with this definition.  Instead of
assuming (as the Second Circuit did) that Congress meant to imbue
"applicable Federal laws" with its broadest possible meaning, we
think that sound principles of statutory construction demand that
we venture beyond the dictionary definition to ascertain the
intended scope of the phrase in this specific context.

At the outset, a close reading of the statutory text
casts grave doubt on the Second Circuit's extravagant
interpretation.  The canon against surplusage teaches that "[w]e
must read statutes, whenever possible, to give effect to every
word and phrase." Narragansett Indian Tribe v. Rhode Island, 449
F.3d 16, 26 (1st Cir. 2006) (en banc).  Courts generally ought not
to interpret statutes in a way that renders words or phrases either
meaningless or superfluous.  See United States v. Walker, 665 F.3d
212, 225 (1st Cir. 2011).  The Second Circuit's interpretation of
the phrase "applicable Federal laws" — which encompasses all
federal laws that apply to state and local governments in any
capacity — flouts this principle by effectively reading the term
"applicable" out of the statute.  For instance, a local government
hardly can certify that it will comply with a law that does not
apply to local governments in the first place.  Congress obviously
could have written this provision to require Byrne JAG applicants

to certify compliance with "all other Federal laws," but it did
not.  In our view, the fact that Congress included the word
"applicable" strongly implies that the provision must refer to a
subset of all federal laws that apply to state and local
governments.  See City of Philadelphia, 916 F.3d at 289.

         To its credit, the DOJ does not ask us to adopt the
expansive interpretation of the "applicable Federal laws"
phraseology proposed by the Second Circuit.  The DOJ argues instead
that its somewhat narrower construction of the phrase does not
render the word "applicable" meaningless because that word limits
the relevant category of federal laws to those that are "germane"
to the Byrne JAG program (and, thus, may constitutionally serve as
conditions on Byrne JAG grants).  See New York v. United States,
505 U.S. 144, 171-72 (1992).  Such a limitation gets the DOJ where
it wants to go since it deems all laws that govern cooperation
between the federal government and states and localities on any
law enforcement issue to be "germane" to the Byrne JAG program.

         This argument has a patina of plausibility.  The words
"applicable" and "germane" both can mean "relevant."  See Webster's
Third New International Dictionary of the English Language
Unabridged, supra, at 105, 951.  But as with the Second Circuit's
blind allegiance to the dictionary definition of the word
"applicable," the DOJ's use of a handy synonym for the same word
does not answer the critical question:  in what sense must a

federal law be relevant in order to qualify as an "applicable Federal law" under section 10153(a)(5)(D)? Once again, we find useful guidance in the canons of statutory construction. The canon of noscitur a sociis points us to the correct answer. It suggests that the "applicable Federal laws" provision must carry a meaning similar to the neighboring assurances and certifications in section 10153(a). As we previously have explained, see supra Part II(A)(1), those assurances and certifications all concern the Byrne JAG application and the programs supported by the grants. In this statutory setting, the phrase "applicable Federal laws" logically denotes laws that apply to states and localities in their capacities as Byrne JAG grant recipients. It strains credulity to think that Congress would bury among those certifications and assurances an authorization for the DOJ to condition grants on certification of compliance with federal laws that require some law-enforcement-related cooperation but lack any nexus to the Byrne JAG program. See City of Philadelphia, 916 F.3d at 289-90.

There is more. Under the DOJ's interpretation of the "applicable Federal laws" provision, it would have substantial discretion to deviate from the statutory formula in order to enforce its own priorities. After all, it would be able to withhold a grant in its entirety based on the recipient's failure to certify compliance with any of the wide array of federal laws

that touch upon law enforcement cooperation.[6]  See id. at 290. Given the formulaic nature of the Byrne JAG program, we doubt that Congress intended to give the DOJ so universal a trump card.

The DOJ strives to persuade us that this reasoning is faulty.  It serves up a list of other statutes that it contends more clearly limit the phrase "applicable Federal laws" to laws that apply in the context of federal funding.  See 42 U.S.C. § 16154(g)(1) (requiring Secretary of Energy to carry out hydrogen energy and fuel cell program in a manner "consistent with the generally applicable Federal laws and regulations governing awards of financial assistance, contracts, or other agreements"); Water Resources Reform and Development Act of 2014, Pub. L. No. 113-121, § 1043(a)(3)(C)(ii)(II), 128 Stat. 1193, 1246 (to be codified at 33 U.S.C. § 2201) (requiring Secretary of the Army to ensure that certain recipients of federal funds for water resources projects "comply with all applicable Federal laws (including regulations)

---

[6] The DOJ implicitly assumes that the Byrne JAG statute allows it to pick and choose the "applicable Federal laws" with which a grant applicant must certify compliance.  See New York, 951 F.3d at 104 ("[T]he Attorney General identifies the laws requiring § 10153(a)(5)(D) compliance certification.").  This assumption contradicts the language of the statute, which states that a Byrne JAG application "shall include" a certification that the grant applicant "will comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D) (emphasis supplied).  Given the clarity of the requirement set forth in the statute, we do not think that the DOJ's discretion to determine the "form" of a Byrne JAG application, id. § 10153(a), is sufficiently elastic to allow it to mandate certification of compliance with only those "applicable Federal laws" that further its own policy priorities.

relating to the use of those funds"). Relatedly, it complains
that the Cities' crabbed interpretation means that it cannot
condition Byrne JAG grants on recipients' certification of
compliance with certain significant public safety laws that do not
apply to states and localities in their capacities as grant
recipients. See New York, 951 F.3d at 107-08 (expressing concern
at "the idea of States and localities seeking federal funds to
enforce their own laws while themselves hampering the enforcement
of federal laws, or worse, violating those laws"). Specifically,
the DOJ points to federal statutory requirements anent the transfer
and registration of firearms. See 26 U.S.C. §§ 5812, 5841.

We are not convinced. As the DOJ's examples demonstrate,
Congress could have used clearer language to indicate its desire
to limit "applicable Federal laws" to those that apply to state
and local governments in their capacities as Byrne JAG grant
recipients. But the perfect is often the enemy of the good, and
Congress cannot always be expected to speak in the clearest
possible terms. In this instance, what counts is that the language
that Congress did use, coupled with the neighboring statutory
provisions and the formulaic nature of the grant program, leaves
little doubt that Congress meant for the phrase "applicable Federal
law" to have this circumscribed scope.

We add — without taking a position as to whether any
laws not at issue here are "applicable Federal laws" — that we

think Congress intended not to condition Byrne JAG grants on
certification of compliance with every law that mandates some form
of cooperation with the federal government on criminal justice
matters. Congress made this intent manifest by stating expressly
in other statutes that noncompliance with those statutes'
requirements could trigger the withholding of a set percentage of
a Byrne JAG grant. See, e.g., 34 U.S.C. § 60105(c)(2).

We find equally unconvincing the Second Circuit's
asserted justification for interpreting the phrase "applicable
Federal laws" to include laws beyond those that apply to state and
local governments in their capacities as Byrne JAG grant
recipients. See New York, 951 F.3d at 105-11. In addition to the
generic dictionary definition of the term "applicable," the Second
Circuit mentioned what it considered the DOJ's broad statutory
authority to determine whether a state or local government
qualifies for Byrne JAG funding in the first place. See id. at
103-04, 107 & n.22.

We do not read the Byrne JAG statute to grant the DOJ
such sweeping authority. We recognize, of course, that Congress
said that a state or local government may not qualify for its share
of Byrne JAG funding in some circumstances. See 34 U.S.C. § 10154
(permitting Attorney General to "finally disapprove [an]
application" after allowing applicant to correct deficiencies);
id. § 10156(f) (directing Attorney General to reallocate funding

to localities if he "determines . . . that a State will be unable to qualify or receive funds under this part").  Still, nothing in the Byrne JAG statute indicates that Congress intended to permit the DOJ to create qualification requirements unrelated to the grant program simply to advance its own policy priorities.  And as the Second Circuit acknowledged, section 10153(a) delineates precisely what an applicant must do to qualify for a grant, that is, proffer the necessary assurances and certifications and submit the required statewide plan.  See New York, 951 F.3d at 104 ("[T]he Attorney General's authority in identifying qualified Byrne applicants is not limitless but, rather, a function of the particular requirements prescribed by Congress.").  The DOJ may determine the "form" of the application and certain certifications, 34 U.S.C. §§ 10153(a), 10153(a)(5), but that power does not allow it to arrogate unto itself the authority to alter the qualification requirements.  Seen in this light, the limited delegation of discretion to the DOJ in the Byrne JAG statute does not support a broad interpretation of the "applicable Federal laws" provision.

That ends this aspect of the matter.  We hold that "applicable Federal laws" under section 10153(a)(5)(D) are federal laws that apply to state and local governments in their capacities as Byrne JAG grant recipients.  Section 1373 is not such a law because it applies to any state or local government, regardless of

whether that government accepts Byrne JAG funding.  The "applicable Federal laws" provision did not, therefore, authorize the imposition of the certification condition.

**B.  The Duties and Functions of the Assistant Attorney General.**

We now reach what may be the DOJ's strongest argument: its assertion that it possessed statutory authority to impose the challenged conditions under 34 U.S.C. § 10102.  This statute lays out the duties and functions of the Assistant AG for the OJP. These duties and functions include overseeing the various components within the OJP and performing certain information-sharing and liaison-related tasks pertaining to criminal justice issues.  See id. § 10102(a)(1)-(5).  In addition, section 10102(a)(6) states that the Assistant AG shall "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants."  Id. § 10102(a)(6).

Seizing on this language, the DOJ submits that section 10102(a)(6) authorizes the Assistant AG to place special conditions on all grants that the OJP administers, including Byrne JAG grants.[7]  The DOJ defines a "special condition" as any grant-

---

[7] Although the DOJ's 2017 announcement of the notice and access conditions called compliance with those conditions "an

wide condition that the Assistant AG deems warranted based on "the circumstances of a particular grant program" (or, as the DOJ put it at oral argument, any condition "germane" to the grant program). The challenged conditions are reasonable requirements for the receipt of Byrne JAG funds, the DOJ says, because they ensure that state and local governments cooperate with federal immigration authorities and, thus, enhance public safety.

As we have explained, see supra Part II(A), the DOJ has not pointed to any provision in the Byrne JAG statute that allows either the Assistant AG or the Attorney General to impose the challenged conditions on Byrne JAG grants. Nor has the DOJ identified any other statute or regulation that gives such authority to either official. It necessarily follows that the DOJ's thesis rests on the notion that section 10102(a)(6) itself confers statutory authority to impose special conditions. In a nutshell, the DOJ reads the phrase "placing special conditions on all grants" as an independent endowment of authority above and beyond "such other powers and functions as may be vested in the

---

authorized and priority purpose" of the Byrne JAG grants, the DOJ has not taken the matter any further. Before us, it has neither defined the term "priority purpose" nor explained why compliance with the challenged conditions constitutes a "priority purpose." Any argument to the effect that the "determining priority purposes for formula grants" language in section 10102(a)(6) authorized the imposition of the challenged conditions is, therefore, waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General." The Cities reject this premise, arguing that placing special conditions is simply an illustrative example of the powers that the Assistant AG may exercise if vested in him elsewhere in the statute or by delegation from the Attorney General.

Our analysis of this provision starts, as it must, with the statutory text. See In re Hill, 562 F.3d at 32. Congress prefaced the phrase "placing special conditions on all grants" with the word "including." In both lay and legal usage, "include" generally signifies that what follows is a subset of what comes before. See Include, Black's Law Dictionary (8th ed. 2004) (defining "include" as "[t]o contain as a part of something"); Webster's Third New International Dictionary of the English Language Unabridged, supra, at 1143 (defining "include" as "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate"). In the same vein, the word "including" most commonly "connotes . . . an illustrative application of the general principle." Reich v. Cambridgeport Air Sys., Inc., 26 F.3d 1187, 1191 (1st Cir. 1994) (quoting Fed. Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100 (1941)). This plain meaning indicates, as the Cities posit, that "placing special conditions on all grants" is an example of a power or function that the Assistant AG may exercise if vested in him

"pursuant to this chapter or by delegation of the Attorney
General." See New York, 951 F.3d at 101-02; City of Philadelphia,
916 F.3d at 287; City of Chicago, 888 F.3d at 284-85; see also
City of Los Angeles, 941 F.3d at 947-48 (Wardlaw, J., concurring
in the judgment). Under the DOJ's alternative interpretation, the
word "including" would mean "and" or "as well as" — a radical
departure from the word's plain and ordinary meaning. See P.C.
Pfeiffer Co. v. Ford, 444 U.S. 69, 77 n.7 (1979).

    What is more, each subsection of section 10102(a) begins
with one or two verbs that define the authority imbued in the
Assistant AG. See, e.g., 34 U.S.C. § 10102(a)(1) (directing
Assistant AG to "publish and disseminate" certain information);
id. § 10102(a)(5) (directing Assistant AG to "coordinate and
provide staff support" to OJP components). Section 10102(a)(6)
starts with the verb "exercise." Id. § 10102(a)(6). Accordingly,
the most natural reading of this provision is one conferring on
the Assistant AG only the limited authority to "exercise such other
powers and functions as may be vested in the Assistant Attorney
General pursuant to this chapter or by delegation of the Attorney
General." The DOJ's more ambitious reading of section 10102(a)(6)
conflicts with the provision's plain meaning by interpreting
"placing" as a second verb that gives the Assistant AG additional
power. Unlike play-doh, the text of a statute cannot be molded
into an infinite number of shapes and sizes to suit the needs of

particular moments.  Here, the statutory language simply does not say that the Assistant AG may "place" special conditions on all grants.

The statutory context surrounding section 10102(a)(6) likewise counsels in favor of the Cities' interpretation.  See City of Philadelphia, 916 F.3d at 288; City of Chicago, 888 F.3d at 285; see also City of Los Angeles, 941 F.3d at 949 (Wardlaw, J., concurring in the judgment).  Section 10102(a) assigns six sets of duties and functions to the Assistant AG.  The first five encompass purely ministerial responsibilities, such as providing information to various recipients, liaising with certain private and public entities, and coordinating the operations of the OJP. See 34 U.S.C. § 10102(a)(1)-(5).  Given the canon of noscitur a sociis, we are hesitant to interpret the sixth and final subsection to grant wide-ranging substantive authority to the Assistant AG to impose special conditions on Byrne JAG grants at his discretion when the neighboring provisions confer only ministerial responsibilities upon him.  If Congress meant to give the Assistant AG the wide-ranging discretionary authority envisioned by the DOJ, we think it would have done so in clearer terms and in a more prominent place in the statute.  See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants

in mouseholes."). Examples of more explicit language that Congress could have employed to give the Assistant AG the power to impose conditions abound in statutes that authorize other grant programs. See, e.g., 34 U.S.C. § 10142(2) (tasking DOJ official with "awarding and allocating funds . . . on terms and conditions determined . . . to be consistent" with the statute); id. § 10446(e)(3) ("In disbursing grants under this subchapter, the Attorney General may impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other program requirements.").

    An additional point is worth mentioning. The DOJ's proposed construction of section 10102(a)(6) is — like its interpretation of the Byrne JAG statute, see supra Part II(A) — inconsistent with the formulaic nature of the grant program. See City of Chicago, 888 F.3d at 286; see also City of Los Angeles, 941 F.3d at 949-50 (Wardlaw, J., concurring in the judgment). This inconsistency is especially hard to ignore here; even the wide-ranging authority that the DOJ purports to find in the Byrne JAG statute covers only a few limited categories of potential grant conditions (for instance, information-reporting requirements under section 10153(a)(4) or certification of compliance with other federal laws under section 10153(a)(5)(D)). By contrast, the DOJ claims that section 10102(a)(6) authorizes it to impose any and all conditions that it deems relevant to a grant program and to

withhold entire grants for noncompliance.  Were such discretion vested in the DOJ, Byrne JAG would no longer function as a formula grant program.

To cinch the matter, Congress added the "including" language to section 10102(a)(6) in 2006 in the same bill that established the current Byrne JAG formula.  Yet the bill contained no cross-reference between the two sections.  See Violence Against Women and Department of Justice Reauthorization Act §§ 1111, 1152(b); see also City of Chicago, 888 F.3d at 286.  Had Congress wanted to authorize the DOJ to deviate from the statutory formula so drastically, we would expect to see a more direct statement to that effect.

The DOJ's arguments for reading section 10102(a)(6) as an independent grant of statutory authority to impose special conditions are unavailing.  Invoking the canon against surplusage, the DOJ contends that accepting the Cities' construction would render the "including" language meaningless because no other statute gives the Assistant AG (or any other DOJ functionary) the power to impose special conditions on any Byrne JAG grant.  The presumption against treating the "including" language as surplusage has particular force here, the DOJ suggests, because a court should presume that Congress intended its 2006 amendment "to have real and substantial effect."  Stone v. INS, 514 U.S. 386, 397 (1995).

A divided panel of the Ninth Circuit relied on this reasoning to hold that section 10102(a)(6) "confirm[s] the authority of DOJ to place 'special conditions on all grants.'"[8] City of Los Angeles, 941 F.3d at 939.  We do not agree.  The plain meaning of a statute is the best evidence of Congress's intent. See Boivin v. Black, 225 F.3d 36, 40 (1st Cir. 2000).  As we already have explained, the statutory language that Congress chose to employ simply does not demonstrate an intent to give the Assistant AG independent statutory authority to impose special conditions.

In all events, there is less to the DOJ's argument that the canon against surplusage supports its position than meets the eye.  Although we aspire to give statutory language more than an illustrative function when the plain meaning of the text admits, we recognize that sometimes "Congress may consider a specific point important or uncertain enough to justify a modicum of redundancy." Mass. Ass'n of HMOs v. Ruthardt, 194 F.3d 176, 181 (1st Cir. 1999). The canon against surplusage is not a straitjacket.  It should not, therefore, be employed inflexibly to rule out every

---

[8] Even so, the panel went on to invalidate the notice and access conditions on the ground that they did not constitute "special conditions."  See City of Los Angeles, 941 F.3d at 944. Concurring in the judgment, Judge Wardlaw concluded — as we do now — that section 10102(a)(6) is not an independent grant of statutory authority to the Assistant AG to impose special conditions.  See id. at 945-46 (Wardlaw, J., concurring in the judgment).

interpretation of a statute that treats certain language as illustrative or clarifying.  See id.; see also Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 226 (2008).  In view of the unambiguous language of section 10102(a)(6), Congress's 2006 amendment appears calculated to remove any doubt that the Assistant AG may place special conditions on all grants whenever this power is vested in him by statute or by delegation of the Attorney General.

Here, moreover, the canon against surplusage is a double-edged sword.  The DOJ's reading of section 10102(a)(6) would itself render meaningless the numerous provisions in other statutes that authorize the agency to withhold set percentages of awards for specific purposes.  See City of Los Angeles, 941 F.3d at 951 (Wardlaw, J., concurring in the judgment).  Why, for example, would Congress have bothered to specify that the DOJ may withhold up to ten percent of a Byrne JAG grant from a state that fails to report the deaths of individuals in custody, see 34 U.S.C. § 60105(c)(2), if section 10102(a)(6) allowed it to withhold the entire grant for the same reason through the imposition of a special condition?  We think it much more probable that Congress intended the word "including" to be illustrative or clarifying than that Congress gave the DOJ authority that would undercut, by implication, so many other statutory provisions.

Specifically, we believe that Congress meant to clarify that the Assistant AG, when vested with such authority pursuant to

statute or through delegation by the Attorney General, may impose individualized special conditions on an award to a high-risk grantee to ensure compliance with the existing terms of the award. At the time Congress amended section 10102(a)(6), a DOJ regulation authorized the agency to impose "special conditions" on a grant to a state or local government if the grantee was "high risk." 28 C.F.R. § 66.12(a)(5) (2006) (repealed 2014). A state or local government was considered "high risk" if it had financial or managerial problems or difficulty adhering to the terms of prior grants. See id. § 66.12(a). The special conditions that the DOJ could impose on an award to a high-risk grantee included restrictions on the disbursement of grant funds, "[a]dditional project monitoring," demands for "more detailed financial reports," and requirements that a grantee "obtain technical or management assistance." Id. § 66.12(b). Identical regulations governed grantmaking by several other federal agencies. See, e.g., 7 C.F.R. § 3016.12 (2006) (repealed 2014) (Department of Agriculture); 34 C.F.R. § 80.12 (2006) (repealed 2014) (Department of Education); see also Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments, 53 Fed. Reg. 8034 (Mar. 11, 1988) (adopting uniform grant regulations for over twenty federal agencies).

We assume — in the absence of some indication to the contrary — that when Congress uses a term of art, it intends the

term to carry its established meaning.  See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342 (1991).  Because Congress did not define "special conditions" as used in section 10102(a)(6), we construe the term to refer to the type of individualized grant conditions for high-risk grantees authorized by 28 C.F.R. § 66.12 and its sister regulations.  See City of Los Angeles, 941 F.3d at 941, 944 (defining "special conditions" in section 10102(a)(6) as "conditions placed on grants to grantees that exhibit certain risk factors or have idiosyncratic issues that must be addressed individually").

This construction finds support in a neighboring provision in the same 2006 legislation.  That provision directs the new Office of Audit, Assessment, and Management — which is tasked with ensuring compliance with various DOJ-administered grants — to "take special conditions of the grant into account." 34 U.S.C. § 10109(a)(2); see Violence Against Women and Department of Justice Reauthorization Act § 1158.  The clear implication of this provision is that Congress intended for the term "special conditions" to refer to individualized requirements imposed on a specific grant.  See City of Los Angeles, 941 F.3d at 941; see also United States v. Nippon Paper Indus. Co., 109 F.3d 1, 4 (1st Cir. 1997) ("It is a fundamental interpretive principle that identical words or terms used in different parts of the same act are intended to have the same meaning.").

Subsequent to the repeal of 28 C.F.R. § 66.12 in 2014, the DOJ's authority to impose individualized conditions on awards to high-risk grantees derives from 2 C.F.R. § 200.207. See 2 C.F.R. § 2800.101 (adopting 2 C.F.R. part 200 for DOJ grants). This regulation describes these individualized conditions as "specific award conditions." Id. § 200.207(a). Here, however, we have no occasion to decide whether section 10102(a)(6) permits the Assistant AG to exercise delegated authority from the Attorney General to impose "specific award conditions" on Byrne JAG grants: the DOJ does not argue that the challenged conditions constitute "specific award conditions" authorized by 2 C.F.R. § 200.207. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). And in all events, the challenged conditions, which the DOJ has imposed as program-wide requirements for all Byrne JAG grants, are not special conditions under section 10102(a)(6) because they are not individualized requirements for high-risk grantees. See City of Los Angeles, 941 F.3d at 942, 944.

The DOJ offers yet another line of argument. To bolster its reading of section 10102(a)(6), it relies on a statement in the legislative history indicating that the 2006 amendment "allows the Assistant Attorney General to place special conditions on all grants." H.R. Rep. No. 109-233, at 101 (2005). This reliance is

mislaid. The cited statement does not provide an unmistakable indication of congressional intent such as might lead us to disregard the plain meaning of the statutory text. See Charles George Trucking Co., 823 F.2d at 688. Although section 10102(a)(6) allows the Assistant AG to place special conditions on grants in certain circumstances, the legislative history tells us nothing about Congress's intent as to the nature and extent of those circumstances. Given the plain meaning of the statutory language, the formulaic nature of the Byrne JAG program, and Congress's use of "special conditions" as a term of art, we have no reason to believe that Congress meant to give the DOJ virtually unfettered authority to impose whatever grant conditions it deems warranted.

Finally, the DOJ compiles a compendium of other requirements, all of which it has styled as "special conditions" and imposed on Byrne JAG grants since the inception of the program. It boasts that these conditions have been neither questioned by Congress nor challenged by grant recipients. This is thin gruel: the lawfulness of these other special conditions is well beyond the scope of this appeal. And to the extent that the DOJ argues that its longstanding practice must signify, through some mysterious alchemy, that section 10102(a)(6) gives it the authority to impose special conditions on Byrne JAG grants at its discretion, we disagree. An agency's implementation of a statute has scant value in determining the actual authority that the

statute confers upon the agency, at least where — as here — the plain text of the statute contradicts the agency's praxis.  See Rapanos v. United States, 547 U.S. 715, 752 (2006) (plurality opinion).  The DOJ cannot take by adverse possession the authority to impose special conditions in a way that shields the devaluation of statutory language from judicial review.  See id.

Nor does the bare fact that Congress in 2016 codified requirements related to body armor that the DOJ had previously imposed as special conditions on Byrne JAG grants, see 34 U.S.C. § 10202(c), bolster the DOJ's adverse possession argument.  We find no support for the inference that Congress, through this codification, meant to endorse the DOJ's expansive view of the scope of its own statutory authority.

To say more would be to paint the lily.  We conclude that section 10102(a)(6) authorizes the imposition of special conditions on Byrne JAG grants only to the extent that such power is "vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General."  The provision does not constitute an independent grant of authority to the Assistant AG to impose whatever conditions he may deem advisable based on the nature of the grant program.  And because the DOJ has failed to identify either another statute that vests authority in the Assistant AG to impose the challenged conditions or any valid

delegation of such authority from the Attorney General, section 10102(a)(6), by itself, cannot authorize those conditions.[9]

## III. CONCLUSION

We need go no further.  When the federal government deals with state and local governments, it must turn square corners. Here, the DOJ took an impermissible shortcut when it attempted to impose the challenged conditions on the Cities' FY2017 Byrne JAG grants — conditions that Congress had not vested the DOJ with authority to impose.  Consequently, the judgment of the district court is

**Affirmed**.

---

[9] Because we conclude that the DOJ lacked statutory authority to impose the challenged conditions, we do not attempt to assess the merits of the several other arguments — including arguments that the imposition of the challenged conditions was arbitrary and capricious and that the challenged conditions violate the Spending Clause — advanced by the Cities.